Good morning, Your Honor, and may it please the Court. My name is Nathan Roberts and I represent the plaintiffs below, the appellees herein. I'm going to endeavor to leave five minutes of my time remaining for rebuttal given the complexity of issues that have been raised, but I want to start by saying that in this case the evidence below and the reasonable inferences from that evidence paint a textbook picture of deliberate indifference on behalf of the medical staff. With regard to the three medical deaths that are still at issue on appeal, we could go through Cowlitz County's own medical records and own witness statements from after the deaths and we discover a customer policy of jailer staff and medical subcontractors quote-unquote monitoring the inmates to the point where their vital signs deteriorate, they have objective symptoms of serious illness to the point that they cannot stand, cannot talk coherently, can't speak, that they're stuporous, they have temperatures of 100 and of course your honor and I mean you can't read this without understanding how serious it is but it's also true isn't it that that facilities like this who process a large number of people who come into them with going through withdrawal from methamphetamine or heroin or whatever, those symptoms of withdrawal can be anything from mild to very extreme without necessarily implicating any other life-threatening issues? I would challenge the court a little bit on that medical assumption. I think that mild withdrawal syndrome typically is not life-threatening. I believe it's known and understood that serious withdrawal syndrome symptoms like those arguably exhibited by some of the plaintiffs in this case are known and understood to be life-threatening. So at the end of the day it doesn't matter whether the vomiting or the 102 degree fever or the altered mental status or the inability to stand, whether it's caused by traditional withdrawal syndrome or whether there's an infectious disease process going on as was quite obviously the case with Mr. Bush who has diminished lung sounds. In any event it's a serious medical need and the folks at this jail who are at most of them are LPNs or CNAs, there's a couple registered nurses walking around, but all they have to do... Yeah and I believe by contract your honor that the physician was only in the building maybe one hour a week or one or two hours every other week so some of the consults are by phone, but they do have physician oversight. I actually believe that's mandated by Washington law. The question is whether it was adequate and I would represent to the court or challenge the court to think about any one of us, presumably without significant medical training, encountering any one of these three individuals the day before they went into cardiac arrest. In the case of Jenny Lynn Borelis with a temperature of 102 degrees had been persisting for two days. She's so weak that she's falling out of bed. She's got jumbled speech and she's vomiting. If one of us encountered that individual in the hallway outside of this courtroom laying on the tile floor it would be immediately obvious to us even in the absence of medical training that that was a serious medical need and that 911 should be called. I have a question about that because at least under the current deliberate indifference standard, leaving aside whether CASTRO should change this construct, there has to be a subjective deliberate indifference. And as I understand the record, jail staff believed that the inmates were faking it. Now that's hard to do if you see someone vomiting, but if you just see someone as you said lying on the floor, it could be, you know, someone who's angry, someone who's tired, someone who's just acting stupid. And it wouldn't necessarily be someone who's ill. So if they truly believed that the inmates were faking, how can we reach the conclusion that there's deliberate indifference of a subjective nature? We have to reach that conclusion, Your Honor, because the people had in front of them confirmed that the plaintiffs were not in fact faking, that the symptomatology exhibited by all three of them cannot be replicated. I cannot hide my pulse from a certified nursing assistant if I want to make it difficult to find. I can't force myself to produce buckets full of vomit. In Mr. Bush's case, I'm unable to mask my lung sounds in my lower lobes when I breathe in and out unless I have pneumonia. There was some indication as to one of them that he or she had bitten into their mouth to cause bleeding? That's what one of the ConMed employees wrote in the report, that there was blood in the mouth and that that had come from a bite. There's a subsequent report, I think from later that day or the next day, where the blood is visible in the back of the throat and it's attributed to having come from the lungs. It's an excerpt of the record 392. It's LCTA as the abbreviation, which is Lungs Clear to Assultation, but diminished at bases bilaterally. Blood at back of throat that appears to be coming from airway will continue to monitor. So, Judge Graber, to answer your question if I can and to challenge the court a little bit, and the defendant particularly, if a subjective statement by a jailer that they believe the person was faking ended the constitutional inquiry, that's all a person would ever have to say to stomp out an Eighth Amendment or Fourteenth Amendment claim for failure to provide medical treatment. If the subjective mistaken belief by a jailer that the prisoner is faking gets them off the hook, there's no set of medical circumstances that could lead to a valid constitutional claim. So, it would be a closer question and a more interesting argument if those were the facts, if we just had subjective symptomatology being reported by the patient. For example, if Mr. Bush had told them as he did that it hurt 10 out of 10, both when he inhaled and exhaled, and that were his only symptom. But here we have much more than that. We have actual medical evidence available to the staff at the time that clearly showed that he was not faking, which makes their subjective statements that he was all the more incredible, as well as the district court's conclusion in his order that there was evidence that he was faking it. He died two days later. Well, the result though doesn't equate to deliberate indifference. That it's a terrible, terrible result. But just as merely saying, well I thought they were faking it, doesn't end a claim. Just saying the result was terrible doesn't establish a claim. So, the fact that these individuals died doesn't necessarily mean that there was deliberate indifference that led to that. Of course not, Your Honor. But in terms of the policy and custom at the Cowlitz County Jail, all of these individuals had objective symptoms that would be concerning, seriously concerning, to anyone without medical training in the There was, he was sent to the ER for an x-ray, right? And it did not show pneumonia? I believe that was prior to his admission or contemporaneously with his admission to the jail on the 15th of January. Right, but doesn't that show some care to be sure that they weren't being indifferent? It does show some care, Your Honor, and that's I think where the district court judge got hung up here, is that the law does not require a complete denial of medical care. And we've cited the Lopez case for that proposition from this court, an en banc opinion from 2000. It's not the complete denial of medical care that's at issue here. Ironically, there were medical professionals who quote-unquote continued to monitor each of these three individuals. You're correct with Mr. Bush that on the 15th he got a chest x-ray before coming into the facility, but... Right, and they later sent him for a mental health evaluation because of their concern that about detoxing and maybe that he was faking some of his symptoms. So it isn't that they were ignoring him. Not completely, Your Honor, but on the 18th of January when he was noted to be sweating profusely, again another thing that can't be contrived or faked, nothing was done. His oxygen saturation levels had fallen to 92 percent. That's at the excerpts of the record, 390 to 91. So this is three days after the chest x-ray and another two days before he's going to go into cardiac arrest. And particularly on the 19th of January, Your Honor, he's screaming in pain because it hurts so badly for him to breathe. And then when they listen to his lung sounds, they notice that they're diminishing and that he's got blood in the back of his throat. I mean, this is a gentleman who's in acute medical distress and the quote from the medical staff who are providing quote-unquote medical care is that they will continue to monitor him at excerpt of the record 392. And that's exactly the pattern in practice, the custom and procedure, is that these medical staff who are not trained to make diagnoses, only to monitor, would continue to monitor vital signs as they went downhill, continue to document, and continue to tell the non-medical jail staff that everything was fine. The only objective symptomatology that seemed to trigger a referral to emergent medical attention and definitive care was the loss of a pulse. In Ms. Deal's case, they had difficulty locating her pulse and that's what caused them to call 911. With the other two, they waited until the inmates were in actual cardiac arrest and their hearts had stopped beating. That's the definition of deliberate indifference. So... Did you want to save some rebuttal time? I'm gonna save the remainder if I may, Your Honor. Thank you. My name is Mark Rosenberg. I'm here on behalf of Apelli ConMed Inc. Oh, there we go. And I'm going to be splitting time evenly, the 15 minutes evenly, with the county's attorney, Guy Bondovich. Just a minute. Kathy, would you put seven and a half and seven and a half? That way they won't eat into each other's time. Just a second. Or five and five, if you'd like. Well, we can just do it at seven and know that there's another half a minute. That's okay. Stop it at 30 seconds. Okay, that's fine. Shall I begin? Please. Thank you, Your Honors. The Kounani claims have been settled and so we're here today only on the claims of the Deal Bush and Bareilles parties. The negligence claim has not been dismissed, so that is still active. So even if the dismissal of the Section 1983 is affirmed, the appellants still have causes of action to prosecute. We're here today only to determine whether the district court's dismissal on summary judgment of the Section 1983 claims should be affirmed. And of course, they can be affirmed on any basis found in the record. And this court should affirm the summary judgment dismissal because the Deal Bush and Bareilles parties have failed to show deliberate indifference, either subjective or objective, either individual or monal claims. Appellants' theories have been a moving target throughout this. They appear to have abandoned those arguments they made in the district court and they make new argument, new theories with each brief they make. The primary argument they appear to be making in their opening brief is basically that a municipality can be held liable for its policy under Section 1983, even if an individual has not been found culpable under that statute. Generally, that has to do with cases... Manifestations of severe problems were such that one can infer deliberate indifference from failing to come to the aid of these three individuals. And as a factual matter, it would be helpful to hear your response to that. Sure. Well, I mean, these cases, the Lopez case and other cases fairly, I believe these are all failure to train cases. No, I'm asking about the individual. There are no individual defendants left. That's right. Okay. We're just looking at the county then. Right. And CONMED. And in fact, on page 30 and 38 of the appellant's brief, they state that they didn't identify any individuals because the individual employee's actions would quote, would likely not rise to the level of deliberate indifference. Now this is a concession. A concession that after extensive discovery, the appellants couldn't point to a single individual who had been deliberately indifferent. And at page 32 of the opening brief, they argue that there is an unwritten policy to prevent physician supervision of nursing staff. This again is a concession. It's a concession that after extensive discovery, they couldn't find any written or expressed policy of the county or CONMED that was deliberately indifferent. Is it your position that a policy has to be written down for it to constitute a policy for 1983 purposes? No, Your Honor. But here's the thing. You do have to show that, and this is in the Castro case, that they were fairly sure, and there's some specific language, that the constitutional violation would take place. Here, after extensive discovery, and I think 10 depositions or more, there is no testimony from any corporate representative. There was no 30B6 scheduled. There was some policy makers who were deposed, but their testimony has not been submitted either in evidence that anybody from CONMED or the county was aware of what the appellants are arguing right now. Nor is there any evidence that a health care provider received an unwritten policy from a policy maker or told a policy maker that there was some hypothetical policy at the jail. There's simply no evidence on which a Monell claim can be based. We're here today to determine whether the district court erred in granting summary judgment on the facts and evidence before it. Now, there were six summary judgment motions filed in the district court. CONMED and the county each filed a separate summary judgment as to the Deal, Bush, and Borrellis parties. That's six summary judgments. The plaintiffs, the appellants here, chose strategically, I suppose, to file one single brief. They didn't even provide it in their excerpts of record. We provided supplemental excerpts of record 143 to 172. And most of that deals with whether there is a standing, whether the negligence claim is met, whether there's a non-delegable duty. They committed only five pages to respond to six summary judgment motions. That's at SCR 159 to 163. And the only argument they made in those five pages was that there was a pattern or practice that certain employees were labeling detoxing inmates as fakers. And now, an employee's failure in this context might lay the foundation for a 1983 claim against that employee, but CONMED or the county wouldn't be vicariously liable for that if they thought their protocols were being followed. So whether or not an objective standard is being used here, all the 1983 claims fail because there's no evidence either that an individual was deliberately indifferent or that there was a policy upon which Monell could rest. But beyond this case, we would ask that the court not adopt an objective new or should have known negligence standard for deliberate indifference to medical needs. And here's why. There's a qualitative difference between Kingsley and Castro and the decisions needed to make medical decisions. The body is a very complex thing. And there are often various ways on which someone can diagnose or treat. And, you know, in Kingsley, you had someone tasering an inmate. The question is do or don't. In Castro, you had should, you know, protecting an inmate from abuse by another inmate, do or don't. Here we have a wide variation. And even negligence claims you need expert testimony as to what was within the acceptable parameters of medical treatment. All the circuit courts that have decided this issue since Kingsley have decided to maintain the subjective standard for medical treatment in 1983 claims. You've got Alderson in the 5th Circuit, Ryan in the 8th, Reif in the 10th, and Melton in the 11th Circuit. In this Alderson case, the concurrence even says, well, I don't think, you know, in regard to Kingsley, we probably should have used that standard. The majority didn't do that. I concur with their result. I think they should have used it. The 5th Circuit knew exactly what it was doing when it decided to use the subjective standard for medical cases. Thank you, counsel. This started at more than your time limit, so. Thank you, Your Honor. Again, we ask that summary judgment be affirmed. May it please the Court. My name is Guy Bogdanovich and I represent Cowlitz County and Jail Director Marin Fox-Hight, who I will point out was sued only in her official capacity. So as to Cowlitz County, there also are no named individual defendants. And I'm going to try not to re-plow ground covered by Mr. Rosenberg. It's our position that the fundamental flaw with plaintiffs or the appellant's position on appeal on these cases is that they have completely failed to justify the shift in focus from what was in the district court briefing on summary judgment versus the new theories they've thrown out on appeal. In their briefing, as Mr. Rosenberg pointed out, single combined response to the six separate summary judgment motions filed below said this, all three deaths involved people who were detoxing from drugs and or alcohol, and in all three cases, staff ignored worsening medical conditions after allegedly labeling each a faker. And what the district court judge said in his summary judgment order is, while there are a few instances where an entity may be liable in the absence of individual liability, plaintiffs fail to identify how any of those exceptions apply to this case. Plaintiffs simply argue that because the injured were on the same detox protocol or in the same jail or seen by the same medical staff, then the county or CONMED must be liable. This is not the law. And the district court judge was absolutely correct in that statement. The other part of that quote from the district court order, which appears at ER 32, the other part that's very significant on appeal, is he pointed out, he acknowledged, there are but the municipality that employs them itself can directly cause a constitutional violation. The court acknowledged there are instances where that's possible, but the court correctly said plaintiffs fail to identify how any of those exceptions apply to this case. And again, that is absolutely correct based on the record that was before the district court. So that brings us to what I think was accurately characterized by Mr. Rosenberg as a moving target on appeal, because what appellants did on appeal then is say, quote, defendants callots in CONMED adopted an unwritten policy of restricting inmates' medical access to nursing staff rather than a physician, even if a physician was indispensable to diagnosing and treating the medical problems. And it seems like the court has picked up on the fact that there was an abundance of medical attention given each of these three inmates. There is no evidence that there was some other lawful requirement to have certain different staffing levels of physician time versus nursing time. Is there a live negligence claim? There's not a negligence claim except against CONMED, correct? Is that right? There is. There are remaining negligence claims against the county and CONMED. Okay. That when the court granted, when the court correctly said, you have not met the constitutional threshold, I'm dismissing all your federal civil rights claims. Those were all remanded. Those were all remanded. They have been refiled in a combined superior court action and are pending. They've been stayed awaiting resolution of this appeal. So as Mr. Rosenberg said, this, what we think at most, that's where this case should be. It involves... What is... I'm sorry. No. You've both pointed out that the alleged policy was different in the district court and here. What is the effect of that alteration, if it is one, on our analysis? Well, I guess first and foremost from our perspective, an issue that wasn't raised below shouldn't be considered on appeal. And that's why we think it's really significant that they totally abandoned the whole theory that they presented to that federal district court judge. Their theory, and they even said in their summary judgment motion, you'll recall that they're part of this appeal. They were appealing the fact that the judge denied motions to continue the summary judgment motions, which were filed on the eve of the dispositive motion deadlines. They were saying, we need more time. One of the things they said in their combined response to summary judgment below is, once depositions of the jail director and frontline medical staff are done, plaintiffs will be able to identify with specificity and name the individual medical providers whose indifference caused these deaths. We know that never happened. And on appeal, they have expressly conceded multiple times, we will never be able to prove. They claim it's because of the sporadic and brief interactions, but they admit, we will never be able to prove any individual violated a constitutional right. And this is very important. We're not just talking a difference in semantics when you're talking about individual liability and municipal liability. It's a whole different level of proof you have to meet to establish municipal liability. And that's why it's so important. The court requires you focus on, you show us what the policy is. Number one, show us a policy that by itself caused a violation of any of these inmates' constitutional rights. And then beyond that, the appellants have to show that that policy was adopted through deliberate indifference. And that's why we think the appellants have failed on both of those prongs of what they now admit is being presented to this court, which is purely a stand-alone municipal liability claim. So if, I guess that, I think that essentially covers our position on it. If the court has any other questions. I don't believe that we do. Thank you. Thank you. The arguments of the plaintiff appellants have not shifted in any way. And that's evident from the record. Well, counsel, your opening brief refers to the custom as an unwritten policy of restricting inmate medical access to nursing staff rather than a physician. Then when you get to the reply brief, you go back to what you said earlier, which is the custom is denying meaningful medical care to detoxing inmates by labeling them as fakers and then ignoring their symptoms until it's too late. Those seem like very different claims to me. One has to do with the policy of who is doing the medical care. The other is how is the medical care being provided and whether detoxing inmates are taken seriously or not. And I don't know whether it makes any difference. But that's my question to you. Does it matter to our analysis if we use the theory that you had at the district court or the theory that you had here? Well, at the district court, we argued that Kalitz and Conrad had consistently labeled the decedents fakers and thereafter discounted or completely ignored their symptoms. Right. And you said that in your reply brief, too. We said that in our reply brief. I think it was the... But not in your opening brief. I think it was the intent of our opening brief to explain that that's why that occurred, Your Honor, that there was no meaningful oversight in the jail by a physician. And as a result, all of the symptomatology was discounted. But no meaningful physician access is a separate thing that has nothing to do with detoxing or faking or anything. If there's a policy that all we have are poorly trained, low-level people and we don't bother with doctors, that really seems like a different theory. And I guess I don't know whether it matters that it's different. It doesn't matter, Your Honor, because this case was supposed to go to the jury and the jury could have reasonably found whatever policy was articulated at trial. It could have been a number of them. It could have been one of them. Well, but for purposes of assessing whether the district court was correct or not in granting summary judgment, are we supposed to limit ourselves to what was said in the district court? Even if this court chooses to do so, there was evidence and there was a policy in practice that should have gone to the jury. We submitted affidavits from two physicians and a nurse with corrections experience and without saying that each one of these individuals, instead of being labeled a faker, should have been seen by a physician and that any competent physician, looking at any of the three of them, would have realized that they were in acute medical distress and provided basic interventions. So that was the, and the failure, the policy and custom of not bringing in a physician, of labeling them fakers and denying them access to someone who could make a diagnosis, was enough, more than enough, on this record for the court to say, these are genuine issues of fact for a jury. Does that answer the court's question? Well, it answers it. I'm not sure whether I agree with it, but I understand your answer. Okay. The moving target really here has been the defense arguments and if you look at the supplemental excerpts of the records, for example, the Cowlitz County briefs on summary judgment, it wasn't contested that there was a serious medical need or that even that group liability as the plans were clearly relying on a Monell theory and hadn't identified individual persons. There was no argument that that theory was somehow legally invalid. Cowlitz County argued that there was no constitutional violation. So they took the care in aggregate and said to the district court, look, we've met our burden of providing some care to these folks, therefore there's no constitutional violation. So when we're responding to summary judgment down at the trial court level, that was the argument we were addressing and that's at the supplemental excerpts of the records, 191 to 96. So the argument hasn't shifted. It's consistently been a Monell theory directly against the denying meaningful medical care to these folks. And the record is rife with, it's chock full of statements of both objective and subjective knowledge on the part of Cowlitz County employees and their subcontractors that these folks were in serious medical distress. We had expert testimony saying that they needed to be seen by a physician and they obviously needed to be seen by a physician and had they done so, they would be alive today and we wouldn't be here. That's the closing argument I should have been entitled to make to a jury in the district court. There were issues of fact and reasonable inferences in our favor that weren't drawn. So we're asking for reversal and remand so that the clients can have that day in court. Thank you. Thank you, counsel. We appreciate the arguments from all three of you. They've been very helpful in this difficult case and the case just argued is submitted.
judges: Tashima, Graber, Mihm